**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 13-20063-CR-GRAHAM

UNITED STATES OF AMERICA,

vs.

LAWRENCE FOSTER and
JOHANA LEON,

     Defendants.

_____/

## ORDER DENYING DEFENDANTS' RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL and DEFENDANT LEON'S MOTION FOR A NEW TRIAL

**THIS CAUSE** came before the Court upon Defendants Lawrence Foster ("Foster) and Johana Leon's ("Leon") motions for judgments of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or in the alternative, Defendant Leon's motion for a new trial [D.E. 402 and 403].

**THE COURT** has considered the motions, the pertinent portions of the record, and is otherwise fully advised in the premises. For the reasons set forth below, Defendants' motions are denied.

### I.    Background

On October 22, 2014, the jury in this cause returned a unanimous verdict finding Defendant Foster guilty of conspiracy to commit wire fraud, in violation of 18 U.S.C. §1349 and six counts of wire fraud in violation of 18 U.S.C. §1343. Although, Defendant

1

Leon was acquitted of the conspiracy and money laundering counts, she was found guilty of three counts of structuring to avoid reporting requirements in violation of 18 U.S.C. §5324(a)(1) and (d)(2). Defendants now move for a judgment of acquittal notwithstanding the verdict pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Alternatively, Defendant Leon moves for a new trial pursuant to Rule 33. The government filed its response and the parties subsequently replied. [D.E. 404, 408, and 411]. During a hearing held in this matter on February 2, 2015, the Court directed the parties to file supplemental briefing on the pending motions for judgment of acquittal. [D.E. 428]. Defendant Foster filed his supplemental brief in support of his motion for judgment of acquittal [D.E. 431], the government filed its response [D.E. 432], and Defendant Foster filed a reply to the government's response [D.E.436], and his corrected supplemental brief [D.E. 437].

Subsequent to his filings, Defendant Foster requested a hearing on his motion for judgment of acquittal. [D.E. 438]. The Court granted Defendant Foster's request for a hearing and on March 16, 2015, oral arguments were presented by Defendant Foster and the government.[D.E. 403]. This matter is now ripe for disposition.

The following summary of the trial evidence is presented in the light most favorable to the government. "United States v.

2

Garcia, 405 F.3d 1260, 1269 (11th Cir.2005) (citation omitted). The Court also makes all reasonable inferences and credibility choices in favor of the government and the jury's verdict. United States v. Topete, 361 F. App'x 78, 79 (11th Cir. 2010).

### A.   Paradise Is Mine Scheme

Paradise is Mine ("PIM") was a company located in Miami Beach, Florida, purportedly offering investment opportunities in a residential real estate development project located in Rum Cay, Bahamas. Defendant Lawrence Foster ("Foster") was the President of PIM. Defendant Johana Leon ("Leon") was the registered agent and a corporate officer. Additionally, Defendant Leon had sole signatory authority over PIM's bank accounts.

To generate interest and sales, PIM issued press releases on the internet that purported the purchase of Rum Cay land by numerous celebrities, including former NFL players Joe Montana and Ray Lewis. The press releases appeared on PIM's web page as "articles." PIM represented that the press releases were legitimate news articles published by or featured in reputable and popular media companies such as USA Today, The Wall Street Journal, and Forbes. [See Govt. Ex. 515d]. The aforementioned media companies however never wrote or published articles regarding PIM or the Rum Cay development.

3

Moreover, to induce investors to invest in PIM, Defendant Foster distributed and caused others to distribute promotional materials, including sales brochures containing the purported news articles featuring stories about PIM's development in Rum Cay. Investors receiving this information believed that PIM's Rum Cay development was a successful venture and that numerous celebrities "purchased" land. Investors believed the PIM "articles" were "featured" in the reputable news sources identified under their respective logos. Investors were not told that the purported articles, which appeared on the PIM web page and in sales brochures, were press releases created by PIM.

During the existence of PIM, at least from December 2009 through January 31, 2013, Defendant Foster directly, or indirectly, solicited investors. Representatives of PIM, including sales staff, contacted potential investors by phone. Specifically, individuals who previously lost money in the stock market or precious metal markets were solicited by PIM representatives. These targeted individuals had previously invested in, and loss money with, companies through transactions brokered by sales representatives now working for PIM. PIM sales representatives were familiar with these individuals and aware of the losses they incurred as a result of their previous investments. As inducement to invest additional money with PIM, the individuals were offered a credit for their previous investment losses. PIM presented this option as an

4

opportunity for investors, to recoup money previously lost in unsuccessful ventures. [D.E. 453, p. 189].

Defendant Foster provided PIM sales staff with training and the script used to pitch the PIM investment opportunity. Representatives, including the sales staff, provided potential investors with PIM brochures that included articles featuring PIM from reputable news organizations such as USA Today, Forbes, and The Wall Street Journal. PIM sales staff repeated the contents of the articles when making calls to potential investors. PIM representatives, including the sales staff, also attached and highlighted the articles from USA Today, Forbes, and The Wall Street Journal when emailing potential investors.

In the calls, emails, and brochures, investors were led to believe that PIM was a successful real estate company which was in the process of developing a residential community in Rum Cay, Bahamas. Investors were offered two opportunities to invest in PIM. The first opportunity allowed investors to invest in marketing, promotional, and business initiatives related to the development of Rum Cay by making loans to PIM, which were collateralized by options to the lots. Secondly, investors could buy options in real estate lots located in Rum Cay.

**1.   Secured Loans**

5

After receiving calls and emails pitching the PIM investment opportunity, and after reviewing PIM's brochure and web page, investors who loaned money, provided PIM with a commitment of funds. [D.E. 453, p. 12]. After receiving the commitment of funds, Defendant Foster emailed investors a secured loan agreement between the investor and PIM. The email also stated in part that PIM and Rum Cay "have been featured in over 377 international publications" including USA Today, The Wall Street Journal, and Forbes. [See D.E. 453, p. 13, Govt. Ex. 150].

The loan agreement between PIM and investors conveyed a "mortgage and security interest" in real property owned by the "company" on Rum Cay. [See Govt. Ex. 252]. The loan agreement defined the "company" as PIM, and investors understood the "company" to be PIM. PIM was the only company named throughout the loan agreement. However, the "Deed to Secure Debt/Collateral Memo" attached as an addendum to the agreement stated that "[t]his document shall serve as a 'Deed to Secure Debt' from PIM whose specific interest has been provided by Sunward Holdings, LTD…." [See Foster Ex. 110, 130]. During solicitation, PIM representatives never told investors that Sunward Holdings owned the Rum Cay land. Investors also were not told of Sunward Holdings' ownership interest prior to providing a commitment of funds. The first time investors learned of Sunward Holdings' interest in the Rum Cay land was upon reading the addendum attached to the loan agreement.

6

## 2.   Land Options

The second investment opportunity was an option agreement which conveyed an interest in Rum Cay lots. The option agreement likewise defined the "company" as PIM. [See Govt. Ex. 205]. Because PIM was the only company named in the option agreement, and the only company investors communicated with, they reasonably understood PIM to be the owner of the property. In some cases, investors were not aware of Sunward Holdings, or its interest in the land, until after making their last payment on the lot. After this payment was made, investors received a subsequent option agreement which listed Sunward Holdings as the owner of the lot. [D.E. 453, p. 171-172; Govt. Ex. 201].

Ken Toppin, the Executive Director for Sunward Holdings, explained that all Bahamian real estate transactions are registered with the Registry of Records in the Register General's Department. [D.E. 458, p. 142]. Unlike in the United States, in the Bahamas, land can be conveyed, transferred, and registered in ownership interest other than fee simple absolute. Individuals can sell, transfer, and register options to land. An option to land is an ownership interest in land which precludes others from purchasing the land. However, the owner of the land option does not have absolute title to the land. In order for absolute title to convey, the seller or purchaser of the option must pay a Bahamian stamp tax

equivalent to 10% of the purchase price to the government. Upon payment of the stamp tax, an additional "document of conveyance" transfers absolute title to the land. [D.E. 458, p. 143]. This is similar to receiving title in "fee simple absolute" in accord with United States law.

Before entering into the option contract with PIM, investors were aware of the stamp tax requirement. PIM advised investors that they could pay the stamp tax and receive absolute title to the land. Alternatively, the investors could sell the option and allow the buyer of the option to pay the stamp tax. Upon payment of the stamp tax, absolute title to the land would transfer to that person. [D.E. 458, p.143]. None of the investors who engaged in the land option investment vehicle received the final document of conveyance because they were hopeful they could sell their option and make a profit. Payment of the 10% stamp tax would have required paying additional funds to the Bahamian government, which in some instance would have been equivalent to approximately $35,000.00. Because the goal of the investment was to make money, investors wanted to avoid diminishing their total return by paying the stamp tax. There is no evidence that any investor exercised the option to land, sold the option to land, paid the government stamp tax, or received absolute title.

### 3.    Funds from Investors

Lavderim Hysa, a forensic accountant with the Federal Bureau of Investigation, conducted a forensic analysis of PIM's bank accounts. Mr. Hysa, identified approximately $8.3 million deposited into PIM's three Bank of America accounts and JP Morgan account. PIM received these funds from individual investors and equity trust entities. [D.E. 456, p. 125]. According to Mr. Hysa, PIM distributed approximately $280,000.00 in partial payments to investors. Less than 3% of the funds collected were distributed as interest payments to investors. [Govt. Ex. 806-A]. The remaining expenditures included cash withdrawals, payments to unknown individuals and entities, sales staff, office related expense, and payments for rare coins and jewelry. [Govt. Ex. 807]. At the time of Defendant Foster's arrest, $1.1 million remained in PIM's bank accounts.

### B.    Defendant Leon Structuring Counts

Defendant Leon, was a corporate officer of PIM, and the sole signatory on PIM's bank accounts. Leon withdrew investor money as cash from the bank accounts of PIM on numerous occasions. In doing so, Defendant Leon structured transactions in amounts less than $10,000 to avoid the reporting requirements of 31 U.S.C. §5313(a).

9

According to the teller at JP Chase Bank, Shawn McBride, he is required to complete a currency transaction report for cash transactions involving more than $10,000.00. [Trial Tr. 10-15-15, p. 41]. Mr. McBride also fills out branch referral notes describing specific transactions of interest. In a March 2011 branch referral note, Mr. McBride describes an encounter with Defendant Leon. According to Mr. McBride, Defendant Leon openly told him that she was trying to avoid the reporting requirement. [D.E. 456, p. 46]. Defendant Leon approached his counter with "three checks to cash... totaling $9,990.00 and the other for a OC." [D.E. 456, p. 51]. Mr. McBride said he does not remember using or the meaning of the term "OC". Id. Nonetheless, it appears Defendant Leon was charged an $8.00 fee for the "OC" transaction. Defendant paid the $8.00 fee with a $20.00 bill, entitling her to change of $12.00. With her original cash transaction of $9,990.00 and change in the amount of $12.00, McBride attempted to distribute $10,002.00 to Defendant Leon. Upon learning that he would be required to fill out a currency transaction report, Defendant Leon asked McBride to reverse the transaction and asked if the fee could be taken from the $9,990.00. If the fee came out of the $9,990.00, then the total transaction would be less than $10,00.00, and McBride would not be required to fill out the currency transaction report. McBride also noted that Defendant Leon "has done this several times before and has had similar transactions." [D.E. 456, p. 52].

## II.   Standard of Review

### A. Rule 29 of Federal Rules of Criminal Procedure

Defendants seek the entry of a judgment of acquittal under Federal Rule of Criminal Procedure 29(c). "A motion for judgment of acquittal is a direct challenge to the sufficiency of the evidence presented against the defendant." United States v. Aibejeris, 28 F.3d 97, 98 (11th Cir.1994) (per curiam). When faced with a Rule 29 motion, the Court should "determine whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." United States v. Grigsby, 111 F.3d 806, 833 (11th Cir.1997) (quoting United States v. O'Keefe, 825 F.2d 314, 319 (11th Cir.1987)).

A "verdict of guilty must stand if there is substantial evidence to support it." United States v. Toler, 144 F.3d 1423, 1428 (11th Cir.1998).Any conflicts in the evidence are resolved in favor of the Government, and all inferences that tend to support the Government's case must be accepted. United States v. Ward, 197 F.3d 1076, 1079 (11th Cir.1999). "A jury is free to choose among reasonable constructions of the evidence." United States v. Williams, 390 F.3d 1319, 1323 (11th Cir. 2004). Thus, the evidence need not exclude every reasonable hypothesis of innocence or be

11

wholly inconsistent with every conclusion but guilt. Id. In short, the Court must determine whether, based on the evidence, a reasonable jury could find the defendant guilty beyond a reasonable doubt. United States v. Ward, 197 F.3d 1076, 1079 (11th Cir.1999). A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt. United States v. Herrera, 931 F.2d 761, 762 (11th Cir.1991).

## B.   Rule 33 of Federal Rules of Criminal Procedure

Alternatively, Defendant Leon moves for a new trial under Federal Rule of Criminal Procedure 33. (D.E. 402]. The power of a court to grant a new trial is much broader than the power to grant a motion for acquittal. See United States v. Ward, 274 F.3d 1320, 1323 (11th Cir.2001). In reviewing a motion for a new trial, "a district court may weigh the evidence and consider the credibility of the witnesses." Butcher v. United States, 368 F .3d 1290, 1297 (11th Cir.2004) (citation omitted). "However, ... the court 'may not ... set aside the verdict simply because it feels some other result would be more reasonable. The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" Id. (quoting United States v. Martinez, 763 F.2d 1297, 1312-13 (11th Cir.1985)).

### III. Analysis

## A.   Defendant Foster

Defendant Foster was convicted of conspiracy to commit wire fraud, in violation of 18 U.S.C. §1349 and six counts of wire fraud in violation of 18 U.S.C. §1343. Under Federal Rule of Criminal Procedure 29(a), the district court, "on the defendant's motion[,] must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a); United States v. Higginbotham, 558 F. App'x 912, 913 (11th Cir. 2014). Defendant Foster attacks the jury verdict asserting that he did not commit fraud in his operation of PIM because: 1) he made no materially false misrepresentations to induce business; 2) he was transacting business with land that had clear and marketable title; 3) he acted in good faith and in accordance with the agreements to which he entered; and 4) his promotional and marketing efforts were ethical and in keeping with the standards of the industry. [D.E. 403]. The Government opposes Defendant Foster' motion asserting that the evidence establishes that he: 1) misled investors by doctoring PIM press releases to look like "articles" from reputable news organizations; 2) misled investors about celebrities "purchasing" land in the Bahamas when no celebrity had title to any land; and 3) misled investors as to the true owner of the land. [D.E. 404].

## 1.  Conspiracy to Commit Wire Fraud and Substantive Wire Fraud

To establish a scheme to defraud, the government must prove a material misrepresentation or the omission or concealment of a material fact calculated to deceive another of money or property. United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir.2009) (citing Hasson, 333 F.3d at 1270-71). "A misrepresentation is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed.'" Maxwell, 579 F.3d at 1299 (alteration in original) (quoting Hasson, 333 F.3d at 1271). The government need not prove that Defendant contemplated harm to a specific, identifiable victim, but rather defendant's criminal intent and criminal culpability can be inferred from the defendant's conduct. Maxwell, 579 F.3d at 1301; See United States v. Munoz, 430 F.3d 1357, 1369 (11th Cir.2005) ("Direct proof of willful intent to defraud is not necessary. It may be inferred from the activities of the parties involved.") (quoting Blachly v. United States, 380 F.2d 665, 676 (5th Cir.1967)); United States v. Artuso, 482 F. App'x 398, 401 (11th Cir. 2012) cert. denied, 133 S. Ct. 1456, 185 L. Ed. 2d 367 (U.S. 2013). It is unnecessary that the victim actually relies on the misrepresentation or omission; proof of intent to defraud is sufficient. United States v. Bradley, 644 F.3d 1213, 1239 (11th Cir. 2011).

The Judicial definition of a scheme to defraud "signifies 'the deprivation of something of value by trick, deceit, chicane, or

14

overreaching.'" United States v. Pendergraft, 297 F.3d 1198, 1208 (11th Cir.2002) ("[T]he meaning of 'scheme to defraud' has been judicially defined.") (citing United States v. Lemire, 720 F.2d 1327, 1335 (D.C.Cir.1983)). All that is necessary is that the scheme be reasonably calculated to deceive; the intent element of the crime is shown by the existence of the scheme. Id.

### a. Material Misrepresentation

#### i. PIM's press releases

The trial evidence revealed that Defendant Foster directed investors to purported "articles" from reputable news sources, such as USA Today, The Wall Street Journal and Forbes, when in fact they were press releases created by PIM.  Elizabeth Kipness, was hired to contact potential investors on behalf of PIM. Ms. Kipness met with Defendant Foster at PIM's offices in Miami where she received a PIM brochure, as well as a script to read to potential investors. [D.E. 452, p. 141, Govt. Ex. 401]. According to Ms. Kipness, the PIM brochure contained a list of 377 publications in which PIM was featured.  Along with the icons, headers, or logos for the publications, the caption read "Paradise is Mine projects have been featured in Forbes.com, USA Today, The Wall Street Journal." Ms. Kipness was further directed to relay this information to potential investors. As instructed, Ms. Kipness referenced these publications when making calls to potential investors.

15

The same representations appeared on PIM's web page. Specifically, PIM's Web page stated "Within the last two years PIM and its projects have been featured in 377 international publications and global media outlets including Forbes, USA Today, Wall Street Journal, ESPN, Scottrade, Yahoo Finance, and The Jay Leno Show." [See Govt. Ex. 515 (a)-(c)]. The headers or logos of these publications appear on PIM's web page along with what appears to be news articles.

Mr. Masoner, an investor, loaned PIM a sum of money. Before agreeing to lend PIM funds, Mr. Masoner received an email from a PIM representative highlighting PIM's recent feature in more than 377 international publications. Mr. Masoner visited PIM's web page where he viewed articles appearing to be from reputable publications. The articles, according to Mr. Masoner, "gave a favorable impression that Paradise Is Mine is a viable institution." [D.E. 453, p. 9]. After visiting PIM's web page, viewing the sales brochures and speaking with a PIM representative, Mr. Masoner committed to investing $200,000.00 in cash and assigning $70,000.00 in lost assets from a previous bad investment. After sending a commitment of funds, Mr. Masoner received an email directly from Defendant Foster that stated in part that PIM had been "featured" in publications including USA Today, Southern Boating, Scottrade, Yahoo News, and The Wall Street Journal. [D.E. 453, p. 15, Govt. Ex. 152]. Mr. Masoner reasonably believed that

16

the articles "featured" in the publications were written by reporters after doing research and analysis of PIM. Id.

Ken Maxwell, an investor who purchased a land option from PIM, received an email from Defendant Foster that included articles from Forbes magazine and USA Today that stated celebrities were purchasing property in Rum Cay. [D.E. 453, p. 161]. Mr. Maxwell visited PIM's web page approximately 15 to 20 times, and viewed articles, before he decided to invest with PIM. Id. After his purchase, Mr. Maxwell began asking Defendant Foster about selling his land option and expressing reservations about his investment. [D.E. 453, p. 171-173]. In response to his concern, PIM reduced Mr. Maxwell's remaining option cost from $157,000.00 to $75,000.00. [D.E. 453, p. 171-172]. After making his final payment of $75,000.00, Mr. Maxwell was sent another option agreement. [See Govt. Ex. 201]. In this final option agreement, Sunward Holdings was named as the vendor and owner of the land. It was at this time, after making final payment for the lot, that Mr. Maxwell discovered that the option contract was between himself and Sunward Holdings, not PIM. [D.E. 453, p. 172]. Prior to receipt of the final option contract, Mr. Maxwell had never heard of Sunward Holdings. Mr. Maxwell testified that he felt anger and disappointment because he was expecting to contract with PIM, not Sunward Holdings. [D.E. 453, p. 173]. Mr. Maxwell expressed concern about the new documents and also inquired about receiving title to his land. Id.

In response, he received an email from Defendant Foster with "links and sites of different advertisements." [D.E. 453, p. 174]. Included were links to what Defendant Foster described as "articles" from Forbes, USA Today, and the Wall Street Journal referencing the purchase of land by celebrities [D.E. 453, p. 174, Govt. Ex. 203]. Mr. Maxwell believed that by "articles", Defendant Foster was communicating that they were published by the various journals. [D.E. 453, p. 175]. According to Mr. Maxwell, reviewing the articles that said Joe Montana had purchased property in PIM felt promising and made him "feel good" about his investment. [D.E. 453, p. 179].

Mr. Bennett, an investor who also purchased a land option from PIM, visited PIM's web page and was "most impressed" with the endorsements that appeared in articles from The Wall Street Journal, USA Today, and Forbes magazine [D.E. 454, p. 69]. Mr. Bennett recalled the web page stating that many famous people, such as Joe Montana and Ray Lewis, had invested in the property. [D.E. 454, p. 70]. Further, when he saw an article, he believed to be published on Forbes.com, on PIM's web page with the caption *Joe Montana Joins a Long List of Notables to Descend to the Island*, it gave the project "credibility." Id. Mr. Bennett also recalled seeing an article published in USA Today on PIM's web page. Again, seeing the article published in USA Today, a publication he subscribes to and reads daily, gave him a "good sense of comfort

18

that this was going to be a very good investment." [D.E. 454, p. 71, Govt. Ex. 402b]. According to Mr. Bennett, after reviewing PIM's web page, he decided to move forward and purchase a lot.  Id.

Following his purchase of property from PIM, Mr. Bennett received an email from Defendant Foster, on March 7, 2011, that referenced links to several "articles", including a Forbes article, which featured Joe Montana's affiliation with Rum Cay. [D.E. 454, pp. 83-85]. In an email of March 9, 2011, Defendant Foster tells Mr. Bennett that PIM had recently been featured in more than 79 international publications and media outlets including USA Today and The Wall Street Journal. [D.E. 454, p. 86]. On April 29, 2011, Mr. Bennett received another email from Defendant Foster with the subject "PIM has appeared in 377 global publications as of 4-29-11." [D.E. 454, p. 87, Govt. Ex. 307]. This email included logos from USA Today and The Wall Street Journal as well as local newspapers from San Francisco familiar to Mr. Bennett. Id. Upon seeing PIM featured in these publications, Mr. Bennett felt very comfortable with his investment. [D.E. 454, p. 89].

Contrary to the representation of PIM, links listed on PIM's web page, and viewed by investors, were not to articles appearing on the publications web pages.  Gaston Nieves ("Nieves"), a senior computer forensic examiner with the Federal Bureau of Investigation ("FBI"), testified that if you clicked on the word "Forbes" on

PIM's web page it directed you to an article. [D.E. 455, p. 175].
Nieves then demonstrated this for the jury. The viewers were
redirected to what appeared to be a news article along with a photo
of Joe Montana. Id. Similarly, the link to The Wall Street Journal,
directed viewers to an article, saved as a PDF file, with The Wall
Street Journal logo at the top, and at the bottom the note "[a]s
published online version of the Wall Street Journal." [D.E. 455, p.
176]. A PDF file is a "portable document format" that captures all
of the elements, including the original graphic appearance, of a
printed document as an electronic image. In other words, the PDF
version of The Wall Street Journal article was not a link to the
article as it appeared on wsj.com at the time of viewing, but
rather a copy of an image. Nieves reviewed the file properties of
the articles. The file properties contained the details associated
with the creation of the article and its data structure. In viewing
the file properties of the PDF version of The Wall Street Journal
article, Nieves determined that Defendant Foster was the author of
the article created February 14, 2010. [D.E. 455, p. 177].  The
file properties for the link titled USA Today Article-Jewels
Discovered.doc, created May 21, 2009, also listed Defendant Foster
as the author. Id.  It can be inferred from the evidence that
Defendant Foster created the image of the articles as they appeared
on PIM's web page.

According to Nieves, the URL, or internet address, for the links on PIM's Web page did not belong to the actual publications. [D.E. 455, p. 179]. For example, as explained by Nieves, the link to forbes.bahamasmediabank.com, is not a link to forbes.com, the actual web page for Forbes magazine. [D.E. 455, p. 180, Govt. Ex. 203]. Likewise, the link for usatoday-jewels.bahamasmediabank.com is not the same as usatoday.com; and the link to wallstreejournal.bahamaswebnews.com is not the same as wsj.com. Id.

Collen Schwartz ("Schwartz"), director of publicity for The Wall Street Journal, testified that while press releases appear on the online version of The Wall Street Journal at wsj.com, they are clearly distinguished from news articles with a notation disclaiming a role in the content creation. [D.E. 455, p. 107]. While "articles" that appear in both the print and online versions of The Wall Street Journal are written by reporters, "press releases" that appear on wsj.com are written by non-reporters, provided by companies other than The Wall Street Journal, and are distributed by public relation companies to media outlets, like wsj.com. Id. Ms. Schwartz identified government's exhibit 515d as a press release titled *Ray Lewis Acquires Land In Rum Cay,* with the Wall Street Journal logo at the top left, and additional information below. [D.E. 455, pp. 108-109]. Ms. Schwartz noted that the purported "article" lacked a byline with the name of the author or reporter who wrote the piece, and the date line was inconsistent

with an article written by wsj.com. [D.E. 455, p. 109]. The last line of the document stated: "[a]s published online version The Wall Street Journal." However, upon a search of the wsj.com archives, Ms. Schwartz was unable to find the article. [D.E. 455, p. 110].

Likewise, Benjamin Abramson, deputy managing editor for travel for USA Today, testified that after looking through the USA Today database, he was unable to locate a purported USA Today article dated March 23, 2009. [D.E. 455, p. 126, Govt. Ex. 402b]. Notably, the "article" included an outdated USA Today logo in the left hand corner. [D.E. 455, p. 127]. This infers that the article could not have been accurate because in March 2009, USA Today used no such logo. The article also contained other stylistic and visual cues that lead Mr. Abramson to conclude that it was not an article published by USA Today. Id. According to Mr. Abramson, in his experience, USA Today does not publish press releases as articles without any alteration. [D.E. 455, p. 129]. Nor does USA Today publish press releases online or in its print newspaper. Id. Also, to Mr. Abramson's knowledge, USA Today does not authorize press releases to be used with the USA Today logo. Id.

Defendant Foster maintains that he did not doctor PIM press releases to look like "articles" from reputable news organizations. Rather, Defendant Foster availed himself of a commonly used

distribution service, Vocus, who produced and distributed the press releases. Defendant Foster contends that PIM never represented the press releases as "articles" written by the publications, but rather noted that PIM was "featured" in them. This means, the press releases were picked up by the media outlets and appeared on their respective web pages. PIM then took screen shots of the press releases as they appeared on the media outlet web page and reproduced them in their marketing and promotional materials. Defendant Foster further asserts that there is no evidence that the PIM press releases were illegitimate or not in accord with industry practice.

In support of this argument, Defendant Foster called Rhonda Harper, an expert in marketing and public relations. In her expert opinion, Ms. Harper testified that PIM's marketing efforts were within the standards, ethics and boundaries of current marketing and public relation practices. Harper testified that in building and increasing the value of a brand it is common for companies to enter into an agreement for professional services with celebrities like Joe Montana or Ray Lewis. [D.E. 457, p. 186]. After entering into such agreements, Ms. Harper testified that PIM contracted with a PR distribution company, Vocus, which has an online service called PRWeb. PIM paid Vocus to issue press releases announcing that they had entered into deals with different celebrities. [D.E. 457, p. 176]. Ms. Harper, having no personal knowledge of the

postings at issue, testified that it is typical for a company to enter into a contract with an online distribution company, create distribution lists, write the press release with a headline and sometimes a sub-headline, and upload the press release to the online distribution service. The distribution service approves the formatting of the press release and decides whether the content is newsworthy. The online distribution company sends the press release to the publications listed on the distribution list. In this case, PIM's press release was sent to business publications, travel publications, and sports publications. [D.E. 457, p. 177].

Ms. Harper explained that posting of the press releases to the internet sites of these media outlets is done by computer algorithms. [D.E. 457, p. 180]. Ms. Harper testified that the press releases are posted to the media outlets' web page without the knowledge or review of the media company. The press release is posted to the press release section of the media outlet's internet site, but it appears under their logo. Id. The press release may remain on the publication's web page for a millisecond or a couple of days. [D.E. 457, p. 181]. The distribution company provides a list to the company of where its press release appeared. To leverage the value of the press release as a marketing initiative, and to extend the life of the information, the company creates a screenshot of the press release as it appears on the media outlet's web page. The company thereafter uses the screenshot in its

24

marketing materials. Ms. Harper testified that PIM could take a screenshot of the press releases, as they appeared on the publications web pages, and email this material, create brochures, or put them on its web page, to leverage and extend the life of the marketing collateral. [D.E. 457, pp. 183-184]. According to Ms. Harper, it is common to cut-and-paste press releases as they appear on the media outlets and "clean" them up by removing unwanted verbiage before pasting them to a website. [D.E. 458, p. 49-52]. It is also common to use old headers or artwork of news outlets in this "clean up" process. [D.E. 458, p. 57]. This practice, as Harper explained, was something typical and standard in the industry.

Ms. Harper further testified that although "feature" is an industry word, as is article, publish, post, and press release, those not in the public relations or media industry, use all of those terms interchangeably. [D.E. 457, p. 189]. Ms. Harper explained that an editor or writer would use the word "feature" in a different, more specific, context than a lay person. [D.E. 457, p. 190].

As instructed by Rule 29 of the Federal Rules of Criminal Procedure, viewing all of the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable

jury could find that PIM's marketing materials and web page included press releases designed to appear as legitimate news articles, when in fact the purported articles were press releases manipulated by Defendant Foster to include logos from reputable news sources. Testimony from Mr. Abramson, the USA Today representative, was that the PIM "article" included an outdated USA Today logo, and other visual cues, that inferred that the article was not published by USA Today. A reasonable jury could find that USA Today, The Wall Street Journal, and Forbes magazine never published or featured articles about PIM. A reasonable jury could also find that Defendant Foster posted the articles to PIM's web page, included the articles in PIM's sales brochures, and directed investors to view the articles knowing that the articles had a natural tendency to influence investors. Additionally, the jury could find that in creating the articles with the logos of news publications such as The Wall Street Journal and USA Today Defendant Foster acted with the intent to defraud. <u>United States v. Maxwell</u>, 579 F.3d 1282, 1299 (11th Cir.2009). Moreover, the jury could reasonably infer that investors viewed the articles either on PIM's web page, or in sales brochures and emails provided by Defendant Foster, before investing money in or purchasing property from PIM. Further, it can be inferred by the jury that PIM's representation that the articles were featured in reputable

publications influenced investors decision to loan money to or purchase land from PIM.

Finally, a reasonable jury could reject Ms. Harper's testimony that PIM's use of press releases in this manner is common place and within the ethical standards of the industry. Based on this evidence, a reasonable trier of fact could find beyond a reasonable doubt that the "articles" were material misrepresentations calculated and used by PIM to deceive investors of money or property.

### ii. Celebrity purchases of land

A jury could reasonably find that PIM made false and fraudulent representations that celebrities "purchased" land in the Bahamas from PIM. Mr. Maxwell testified that he was assured that there were numerous celebrities including Ray Lewis and Joe Montana, who "purchased" lots in the Bahamas. Additionally, after reading articles about celebrities owning land in Rum Cay, he believed celebrities paid PIM money for property in the same development where his lot was located.

Although PIM represented that football MVP Joe Montana and other celebrities purchased land, they actually signed a professional services agreement with PIM, in essence bartering the use of their name in exchange for a land option to a lot in Rum

27

Cay. Mr. Montana was not required to pay any money for his land option, but instead would be paid by PIM for his endorsement of the project. Such agreements are not uncommon between companies and celebrities, however, notwithstanding PIM's representations, no celebrities, including Joe Montana, in fact received absolute title to any land in Rum Cay.

A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts, reasonably calculated to deceive persons of ordinary prudence. United States v. Hasson, 333 F.3d 1264, 1270-71 (11th Cir. 2003). A Misrepresentation or omission having a natural tendency to influence, or is one on which a person of ordinary prudence would rely, is sufficient to constitute a scheme to defraud. Viewing the evidence in the light most favorable to the Government, a reasonable trier of fact could find, that Defendant Foster's claim that numerous celebrities, including Joe Montana, bought or owned land, rather than an option to land, in Rum Cay was a material misrepresentation that an ordinary person would rely upon in making a decision to invest in PIM. This misrepresentation in conjunction with omitting the fact that celebrities in fact bartered services for land options rather than purchased lots, lead a reasonable jury to find it was calculated to deceive investors.

28

### iii. Land ownership

A reasonable jury could find that Defendant Foster misrepresented the true ownership of the Rum Cay land in the Bahamas. Despite representations to potential investors that PIM owned and was developing land in the Bahamas, PIM in fact did not have title to any land in the Bahamas. Instead, Sunward Holdings, owned the land. Sunward Holdings land ownership was not disclosed to potential investors in PIM's marketing materials or during its initial sales pitch.

PIM was defined as the "company" in the agreements with investors and was the only company known to investors. Investors were not told, prior to committing funds, or signing the option contracts, that Sunward Holdings, and not PIM, owned the land. Investors testified that they were surprised to see Sunward Holdings named in the final option contract or attached addendum as owner of the land.

Ken Maxwell learned of Sunward Holding after making his final payment for his lot and receipt of a third option contract. Mr. Maxwell was angry and disappointed to see Sunward Holdings instead of PIM named in his final option contract. Mr. Maxwell expressed his reservations to Defendant Foster about his investment upon learning that he was entering into an agreement with an unknown company.

29

Given this record, it is reasonable for a jury to find that PIM's failure to disclose Sunward Holdings as the land owner in the loan agreements and land option contracts was calculated to deceive investors. A reasonable jury could find that investors believed that PIM owned the Rum Cay land and that Sunward Holding's land ownership was a material omission. The failure to provide this information to investors is a material misrepresentation or omission sufficient to support a reasonable jury's guilty verdict.

### iv. Investor Funds

Through PIM's misrepresentations, the company collected approximately $8.3 million from investors. PIM paid out approximately $280,000.00 in partial payments to investors. Less than 3% of the funds collected were distributed as interest payments to investors. [Govt. Ex. 806-A]. The bank records show that PIM withdrew the remaining funds for items including cash withdrawals, payments to unknown individuals and entities, payments to sales staff, office related expenses and payments for rare coins and jewelry. [Govt. Ex. 807]. At the time of Defendant Foster's arrest, $1.1 million remained in PIM's bank accounts. A reasonable jury could infer that PIM's use of the funds were in furtherance of the fraudulent scheme.

B.   **Defendant Leon**

### 1. Structuring Transactions to Avoid Reporting

Defendant Leon was found guilty of three counts of structuring to avoid reporting requirements in violation of 18 U.S.C. §5324(a)(1) and (d)(2). She contends the government failed to demonstrate that she knowingly structured transactions to cause banks to fail to file transaction reports, that the purpose of the transactions was to evade the reporting requirements, or that the transactions furthered another Federal crime as part of a pattern of illegal activity involving more than $100,000.00 in a 12-month period. [D.E. 402]. The Government responds that the evidence clearly shows that Defendant Leon was aware of the reporting requirements and took affirmative steps to avoid them. [D.E. 404].

Defendant Leon asserts that she did not knowingly structure cash transactions to avoid the currency transaction reporting requirement. However, there is direct and circumstantial evidence of Leon's knowledge of the reporting requirement. Specifically, Mr. McBride, a JP Morgan Chase Bank teller, testified that, according to his recollection, based upon his internal notes, on March 25, 2011, Defendant Leon came to his counter with three checks totaling more than $10,000.00. McBride testified that if there is a transaction involving more than $10,000.00, he is required to fill out a currency transaction report. [D.E. 456, p. 44]. According to

31

McBride, Defendant Leon openly tried to "avoid the reporting" requirement. [D.E. 456, p. 45, Govt. Ex. 701]. The bank records reflect that Defendant Leon stated that she did not want to complete a currency form, and wanted to restructure her transaction to avoid having to complete the form. According to the bank records Defendant Leon previously completed similar transactions to avoid the reporting requirement. [D.E. 456, p. 46]. Moreover, the bank records reflect a clear pattern of dividing transactions into numerous smaller transactions to avoid reporting requirements. For example, from November 30, 2012, to January 30, 2013, Defendant Leon made cash withdrawals on 13 days over $9,750 but below $10,000, in different combinations of cash withdrawals, and check withdrawals from different branches.

The *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom. See, e.g., Ratzlaf v. United States, 510 U.S.135, 149 n. 19, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (noting that "jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct"). A verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable. United States v. MacPherson, 424 F.3d 183, 190 (2d Cir. 2005). While there was direct evidence that Leon knowingly structured financial

transactions with McBride to avoid the reporting requirements, the totality of circumstantial evidence also permitted a jury to reasonably find that Defendant Leon engaged in a pattern of structuring transactions with the requisite guilty knowledge and intent.

Defendant Leon contends that she acted at the direction of Defendant Foster. Defendant Foster, without her input, determined how PIM's money was to be spent, and how transactions were to be structured. However, the jury could have reasonably inferred from her pattern of structuring, and her statements to Mr. McBride, that she knew of and intended to evade currency reporting requirements. Id.

Notwithstanding Defendant Leon's assertions that she acted at the direction of Defendant Foster or that he signed her name to checks, her knowledge and intent to structure transactions to avoid reporting is supported by the evidence. The testimony revealed that upon learning that her transaction exceeded $10,000.00, and required a report, Defendant Leon asked the teller to cancel her transaction. Moreover, she had completed similar transactions in an effort to avoid the reporting requirement. Whether or not she acted at the direction of Defendant Foster is not relevant to her conduct as charged. Viewing the evidence in the light most favorable to the government it is reasonable for a jury to conclude that Defendant

Leon, personally or while aiding and abetting others, structured transactions that divided a sum over $10,000.00 into smaller cash transactions in violation of 18 U.S.C. §5324(a)(1) and (d)(2).

With regards to Defendant Leon's motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, the Court does not find that the evidence preponderates heavily against the jury's verdict, such that it would be a miscarriage of justice to let the verdict stand. Butcher v. United States, 368 F.3d 1290, 1296-97 (11th Cir. 2004). Accordingly, Defendant Leon's motion for new trial is denied.

## IV.  Conclusion

After considering all of the Defendants' arguments, the Court finds them without merit. The evidence, taken in the light most favorable to the government, is sufficient to support the jury's verdict. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendant Foster's Motion for Judgment of Acquittal notwithstanding the Verdict [D.E. 403] is **DENIED**. It is further

**ORDERED AND ADJUDGED** that Defendant Johana Leon's Motion for Acquittal or in the Alternative for a New Trial [D.E. 402] is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 22nd

day of April , 2015.

_____
DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE


cc:  All Counsel of Record